Case number 22-7157, et al. Trustees of the IAM National Pension Fund versus M&K Employee Solutions LLC, at balance. And case number 23-7028, Trustees of the IAM National Pension Fund versus Ohio Magnetics, Inc., et al., at balance. Mr. Connealy, for the at balance, issues common to all at balance. Mr. Vogel, for the at balance, free look exception issue. Mr. Roberts, for the appellee. Mr. Connealy. Good morning, your honors. May it please the court. My name is Michael Connealy. I am arguing today on behalf of all the defendants on the actuary assumptions issue in this case. Mr. Vogel will be arguing on the free look exception, and I'd like to try to reserve two minutes for rebuttal, if possible. Your honors, section 1391 provides that withdrawal liability must be based on unfunded vested benefits or UVBs as of the measurement date. By its plain terms, this means the UVBs calculation must reflect how things stood on the measurement date, not anything that occurred after. Here, however, the fund undisputedly assessed liability using a UVBs calculation that was based on developments after the measurement date. The basic facts on this aren't in dispute. On December 31st, 2017, plans actuary, Pyron, endorsed a 7.5% discount rate for withdrawal liability and no administrative expense load. Pyron had just applied these exact assumptions two months earlier on November 2nd in the 2017 valuation report. And a few weeks after the measurement date on January 24th, Pyron presented the same assumptions to the trustees as the current policy. Only then did Pyron change the December 31st assumptions with the trustees input. And those new assumptions had the effect of increasing the fund's UVBs by a multiple of six. This calculation of UVBs based on developments after the measurement date violates section 1391 as the only other circuit to address this question has held. To calculate UVBs as of December 31st, an actuary must use the assumptions that the actuary deemed appropriate on December 31st. It may not use contrary assumptions that reflect events after December 31st merely because it later adopted different policies and objectives. Much will- Can I ask you a hypothetical? Imagine that a company has a hundred employees, but on the measurement date, the kind of auditor or whoever kind of comes up with these type figures is only aware of 80. And then a week later he learns, oh, they hired 20 more before the measurement date. So now there's a hundred employees. Would the calculation for liability as of the measurement date be able to factor in those extra 20 employees? Your Honor, we don't dispute that the assessment of withdrawal liability needs to be based on the actual real world facts that existed that day. But actuarial assumptions aren't just a dry, objective assessment of the objective facts. As this court explained it in Energy West, as applied to the discount rate assumption, the assumption is going to estimate how much interests the plan's assets will earn based on their anticipated rate of return. I get the kind of labeling difference there, but if what's supposed to happen is the actuary figures out, okay, there were actually a hundred employees, even though I only knew about 80 on the measurement date. Why shouldn't the actuary ask himself or ask herself, okay, the discount rate and the most accurate, reasonable term from the statute, reasonable discount rate on the measurement date turns out to be 6.5%. I would have thought back in November, a month before the measurement date that it was 7.5%. But now that I kind of have all the information that would have been available had I known everything up to the measurement date, put labels aside, why is the employee's hypothetical different than the discount rate hypothesis? Sure, two points on that, Your Honor. The first is that the actuarial assumption about the discount rate isn't going to be based on how many participants are in the plan. It's based on the investments held by the plan and the anticipated rate of return. But then the second and possibly more substantive answer, I think to Your Honor's question is that the actuary here described the change in actuarial assumptions in 2018 as based on policy. And that's, I would particularly recommend that the court review the PowerPoint presentation that Chiron presented on January 24th. That seems like if it was a mistake, it goes to the question of whether the discount rate was reasonable or not. It doesn't seem like it goes to the question of what events was the actuary allowed to consider kind of in between the last time a discount rate was calculated in November and the measurement date, December 31st. Well, it's both, I think, Your Honor. And for this case, the only one of those two questions that's relevant is the timing issue. But it does go to timing because as this PowerPoint presentation explains, there are policy ramifications to different actuarial assumptions. Well, you can argue that, you know, the arbitrator and then eventually to the district court again. And I think you will probably have some really strong arguments that the gap dropped from 7.5 to 6.5 was unreasonable, especially because it seems like the actuary wanted it to be seven and then there was some kind of like smoke-filled room and into it and they came out of it, voila, it's 6.5, but that's not our case. Well, it's not just the reasonableness, Your Honor, because as this PowerPoint presentation says, it's a question of the trustee's input. And that's at page, I think it's at 239 potentially of the joint appendix, oh, sorry, 236, is the discount rate is determined by the actuary with the trustee's input. And here the parties stipulated that it was only following discussion with the trustees, this is a joint appendix 39 and this is Ohio Magnetic's joint appendix, that the change happened. And I think especially when you have a decoupling of the funding discount rate from the withdrawal liability discount rate, that is inevitably going to be a policy-based determination because they're supposed to be measuring the same thing as this court pointed out in Energy West. Those points don't vote the legal question before us about whether the actuary can make a determination after the measurement date based on assumptions in place at the time of the measurement date. I think it does go to the question, Your Honor. How does it relate? Because it seems to be, there seems to be a lot of factual things that are alleged that sort of suggest some kind of wrongdoing. And again, maybe as Judge Walker said, you can raise those before the arbitrator. I don't know if they were properly preserved in the arbitration, but how do they go to the legal question? We have to decide. They're not just about wrongdoing, they're about timing because on December 31st, the actuary had a set of actuarial assumptions that he thought were the best estimate of anticipated plan experience. And then only after that date, which everyone agrees, the measurement date is the snapshot date and withdrawal liability must be fixed on that date. Only afterwards did he revisit that. So what is the exact problem? Is the problem that an actuary can't be trusted to look at the assumptions on December 31st after December 31st? Or is your contention that that didn't happen in this case? Because those are, like it's not clear precisely what the problem is because you agreed with Judge Walker that you could change, you could understand the number of beneficiaries after December 31st to accurately update for the amount of beneficiaries. Why can't the same be true for actuarial assumptions? Well, we're not making just a policy argument here, Your Honor, about there being a problem that Congress would need to address. We're saying that as 1391 is currently written, there's a freezing of UVBs under Combs, the UVBs are fixed on that date. And if the UVBs change on that date based on things that happen afterward, they're no longer fixed. It's a question of whether they're, I agree with you that the statute says the UVBs must be fixed. I take the question here to be whether that fixed amount can be calculated after December 31st. It's not just whether it can be calculated after December 31st, it's whether it can be calculated based on actuarial assumptions that were- Can it be calculated after December 31st? Yes, it can be calculated after December 31st. But the statute defines UVBs, this is at 13, or sorry, 1393C, as the value of non-forfeitable benefits under the plan less the value of assets. And the value of non-forfeitable benefits is going to be the present value. So by the definition of UVBs, the actuarial assumptions are baked in. You can't get the present value of future benefits without- My pronoun in my last question occurs to me might've been imprecise. Can the discount rate be calculated after December 31st? No, not if the discount rate is going to be different than the one that was in place on the measurement date. And that's because the UVBs on that measurement date are by definition, a function of actuarial assumptions as applied to real world facts. And- We're not disagreeing that the information available as of 1231 is the information on which any of the assumptions should be made. But the actuarial assumptions that were adopted in January weren't based solely on the information available on December 31st, because they depended on this meeting with the trustees where the trustees provided- Based on what was available as of December 31st, even if calculations come later. Yes, there's no question they cannot be based on information that wasn't, in our view, at least. Maybe the fund disagrees, but you cannot consider any information that arose after the measurement date. And even the district courts here agreed with that. But our point is that it also can't be based on a change in policy direction that occurs after the measurement date. And here, the actuaries- I just don't see how we can't say, maybe you're right about that, but that's not the issue presented in this case. It is the issue presented in this case, because the question is whether those actuarial assumptions are different from the ones that were in place on the measurement date. And there's no doubt that they were. And part of the reason why, and this is at page 238 of our joint appendix, the actuary explains that there are different practical effects in differences in actuarial assumptions if you have a more conservative discount rate, you give more protection to ongoing employers. Then they had this executive session with the trustees, and afterwards they adopted a different rate that wasn't even one of the rates that they had modeled in their presentation, and set aside whether any of that was wrongdoing. That's not the issue for the court. What is clear, though, is that it is a change that happened after the measurement date, and that, but for that change, would not have affected the measurement date that was in place on December 31st. The question here is not whether assumptions and events, considerations after the measurement date can be factored into the discount rate. I thought the question here was, there was a discount rate calculated in November. The measurement date is December 31st. And the question is, after December 31st, can an actuary consider stuff that happened between November and December 31st when calculating what the discount rate was on December 31st? I thought that, isn't that the question? I don't think so, Your Honor. And there's no dispute here, but the actuary can account for information that arises from one actuarial evaluation report to the measurement date. And there's nothing that would have prevented Chiron from updating the discount rate or any other assumptions before 1231. The only question here is whether the actuary can decide with the trustees' input to change policy direction and be perhaps more conservative in the discount rate to provide more benefit for ongoing employers. I think we just have to be clear about what, I mean, so are you saying that the rate that was chosen in January is not even on its own terms trying to measure what the discount rate was on December 31st? Well, that would be the later question that would have to be decided if this case, if we lose on the timing question. So you're not arguing that? No, we're arguing though that it is a rate that is not just a dry objective. And I think this is what- Do you agree that in January you can look backwards and calculate a discount rate as of December 31st? No, no, we're saying you have to use the discount rate that's already, one you hold on December 31st. You can apply that to facts. I'm sorry? They didn't, there wasn't an actuary working on New Year's Eve at deciding, okay, this is the discount rate today. The discount rate was calculated in November. And then I think I heard you say a couple of minutes ago that you don't have any problem with us holding that an actuary can update the discount rate after December 31st. So long as the actuary is only considering things that happened before December 31st. No, you're right. I did not say that. I said that they can apply their actuarial assumptions on December 31st, the ones that they have on December 31st to facts, real world facts, like the number of participants and how much those participants benefits, or sorry, what benefits they're entitled to under the plan. They can apply the old actuarial assumptions, the ones on the measurement date, to facts that don't get revealed until after the close of markets on the measurement date. Why is the actuarial assumption not a fact in the world on December 31st, like the number of beneficiaries? Like you agree that things like the number of beneficiaries, you can make sure you have the right number as of December 31st, and you could verify that in January. Why can't you do the same thing with the actuarial assumptions? I mean, I take that to be in part what Judge Moss says in his opinion, and that seems, I don't know, fairly reasonable. Well, I agree that this is a very important point. I think the district court's been off-track on this very point. And the reason why it's not a fact that just exists out in the world is because as this court explained in Combs, actuarial evaluations are based not just on plan experience, but also the professional judgment of the actuary and the theories and expectations to which the actuary describes. To my earlier point, is it just that we don't trust the actuary in January to properly figure out what the actuarial assumptions were in December? Is that your question? Well, I wouldn't put it in terms of trust, Your Honor. I would put it in terms of a new thing is happening after the measurement date that's dispositive. But you said that question is not before us. You said the question is not before us whether the actuary in January was using information from January. I mean, we're just focusing on the legal question of whether the actuary can try to calculate the assumptions in place on December 31st in January. I mean, the actuary may have done that incorrectly or unreasonably, but that's not the question before us. Well, I think the question before you is whether those actuarial assumptions are really just like a reflection, like a mirror image of facts that exist in the world, or they're an actual new occurrence because the actuary is looking at those facts and forming a judgment about- So you're saying it's impossible to determine actuarial assumptions at a date in the past? Like that's not something that can be identified. I think it's always going to be anachronistic to say at time X, that at time X minus five, actuarial assumptions were whatever you're saying in the future. Is it because of the nature of actuarial assumptions? Exactly, exactly. They're very laden with policy decisions as Chiron's own PowerPoint presentation to the trustees acknowledged. And I think, I just want to note that there's no dispute here, and this is a JA 700, the undisputed facts of summary judgment in our case, that there had been no change to your honor's question about whether the actuary actually had an actuarial assumption on December 31st. The parties were not, they stipulated, or there was an undisputed statement of facts that says there had been no change of the actuarial assumptions before 1231. And that's a page 700 of our joint appendix. So I don't think that there's... The other point I would make your honor is that the PowerPoint presentation also reflects those 2017 assumptions as quote unquote current policy. And on page 246 of our joint appendix, Chiron reaffirms that the assumptions reflect our understanding of the likely future experience of the fund and the assumptions taken individually represent our best estimate for the future experience. So there's no... Let's say that you're entirely right. This was a terrible PowerPoint presentation. They considered all kinds of things that they weren't supposed to consider. Those are facts specific to this case. And we have to say what the statute means and that will apply to all other cases. And I think that the implication of your argument is that if the last time there was an update discount rate was in November, and then a pandemic hits on December 25th, then in January, an actuary calculating the discount rate on December 31st has to pretend that the pandemic didn't hit, didn't happen. It's just close his eyes to that event. Is that the implication of your argument? That is the implication, but it's not that odd your honor, because remember discount rates and other actual assumptions are supposed to capture decades worth of future projections. It's not just gonna be about the state of the market at a given point in time. And also even under the district court's view, that sort of mental gymnastics would be necessary if that pandemic hit on January 5th. So it's gonna be difficult for the actuary to do that calculation. You don't require them to close their eyes to the additional 20 employees that were hired in my hypothetical, even if they didn't know about them the last time. No, because that's just numbers. Those numbers will come in, we'll know what the values of the accounts were after the close of markets on December 31st. And those numbers aren't susceptible to movement one way or the other, they are what they are. But the actuarial assumptions by their nature are not. They are dependent on the views that the actuary is holding at the time, possibly the views of the trustees, but set that aside. And they are therefore not the kind of thing that just exists as a brute fact out in the world. And I see I'm over my time, your honors. Mr. Vogel would be happy to address the pre-look exception. Thank you. Thank you. Thank you. Good morning, your honors. May it please the court. My name is Don Vogel and I represent M&K Employee Solutions. Kind of doing a little backwards here because M&K is actually the appellee in the funds appeal of the five-year free look issue. In the short amount of time I have with you, I'm just gonna address that five-year free look issue and confirm that the district court did hold that it's applicable to M&K. What the trustees try to argue is that there should be an additional requirement written into the statute. And that is not only must a employer like M&K partially withdraw within five years, but it must also completely withdraw within five years and stop participating. It tries to argue that if you uphold the district court's decision, it will promote a fractionalization among employers like M&K. And the statute actually cures that by treating all trades or businesses in common control as a single employer. So the mere fact that one of M&K's series entities partially withdrew and another entity continued to participate beyond the five-year free look time is of no moment because the statute specifically provides that a partial withdrawal is included in the five-year free look exception. So that when you walk through the statute like the district court did, and you look at all of the elements which the fund agrees M&K has met, you will find that they are entitled to the five-year free look. And in fact, as we are remanded to the arbitrator, that treatment is such that the contributions of that particular entity should be excluded from the calculation of the subsequent complete withdrawal. If you have any questions, it's a pretty straightforward issue. Very well, thank you. Thank you very much. Good morning, your honors. May it please the court. My name is John Roberts from the firm Proskauer Rose, and I represent the trustees of the IAM National Pension Fund. I think based on Appellant's presentation, there's a little bit of confusion as to what the issue is before the court today. The issue before the court is a pure legal question. Did Congress, does Congress require actuaries to select their assumptions on or before the measurement date? That is a purely legal question. That is the only question that was presented to the arbitrator below. It does not turn on the facts of this case at all. It applies, as Judge Walker noted, to every case that will involve calculations of withdrawal liability. And I think it's important to note there was no factual development below because there was just this legal question presented to the arbitrator. So all this talk about PowerPoint presentations and smoke-filled rooms, there's been no factual development on any of these issues. To the extent Appellants want to argue that there was something untoward occurred and that it was the plan that somehow manipulated the actuary into selecting, they can, to the extent the arguments are preserved, they can make those arguments on remand. But that's not for this court to decide. The issue for this court is, did Congress intend to require actuaries to select the assumptions they used to calculate withdrawal liability before 11.59 p.m. on the measurement date? And our view is that that proposed deadline has no support in ERISA's text. And in fact, it would conflict with the statute's best estimate requirement. Congress gave actuaries one directive when selecting their assumptions. They're supposed to use assumptions that reflect their best estimate of the plan's anticipated experience. Appellant's proposed deadline can't be reconciled with that best estimate requirement. Just take this case as an example. The actuary here determined the assumptions that reflect its best estimate of the plan's anticipated experience. But under Appellant's theory, the actuary wouldn't be allowed to use those assumptions because they were selected a mere three weeks after the measurement date. Instead- Mr. Rooks, do you agree that the assumptions, that the actuary has to use assumptions that were in place on December 31st, has to like look backwards and try to figure out what the right actuarial assumptions were as of that date? Yeah, I just wanna be careful about that term in place. Right, that's Appellant's position. Appellant's position is that there had to be some sort of- That the actuary in January, when figuring out the discount rate, has to look at the conditions or the economic conditions at the time. Correct. Of December 31st. Yes, that is our position. And that is what occurred here, which will be shown on remand if that ever gets litigated later. These selections, these assumptions were selected three weeks after the measurement date, and they were based on the information that was in place on the measurement date. But that's for the remand. Well, if the calculation was made six months, it was made in June of the following year, would they still have to look at the economic conditions in place as of December 31st? Yes, so that, and that, yes, Your Honor. And that's our position, and that's the position that the district court took below. Now, I wanna be clear about something. The question presented to this court is, do the assumptions have to be selected on or before the measurement date? If you agree with us on this, that raises this secondary question as to what information the actuary can use when making that selection. And there's two options. Either they have to use the information available on the measurement date, or they can use information up to the date of the calculation. We're ultimately agnostic on that second question, because if you even get to that second question, you've already agreed with us that they're allowed to select the assumptions after the measurement date. And either way, we will prevail, because here, as I said, the facts will show that nothing material happened between the measurement date and the three weeks later when the actuary selected their assumptions. There's no reason to think that Congress wanted actuaries to select their assumptions before the measurement date, given that complete information about the plan isn't available until after the measurement date. As this court explained in the Energy West case, an actuary's best estimate is supposed to be based on the plan's actual characteristics and experience. But complete information about a plan's characteristics and experience through the measurement date typically isn't available until after the measurement date, and it takes time to gather and analyze that information. So a best estimate of a plan's anticipated experience typically can't be made until after the measurement date. A balance proposed deadline would force actuaries to select their assumptions before all the information about the plan year is available,  but it would mean that the actuary's assumptions in some cases won't reflect its best estimate. Robert, let me ask you a question about something you said a couple minutes ago about that secondary question. You said we don't have to reach it. I think both district court opinions on a review did reach it, and if we affirm, won't we be endorsing the district court's answer to that secondary question? Your Honor's correct that the district court did decide that question and said that the actuary is supposed to consider only information up through the measurement date. I mean, the court can write the opinion anyway. It decides to write the opinion to make it clear what its position is, but my point is that if you even get to that question, we've already won the case because that only comes up if the actuary's permitted to select the assumptions after the measurement date, and in this case, there's no issue there because the assumptions were selected, as I said, a mere three weeks. The future district courts are gonna need to know what to do, and I think your opposing counsel would have a decent argument that, I remember right, you did not cross-appeal on this issue. Am I remembering that right? That's correct. And so, arguably, you've abandoned the position you took below that the answer to the secondary question is that the actuary can consider events that occur after the measurement date. So I think you've abandoned it, and therefore, we affirmed the district court. We would be telling future district courts to do what the district court did here. Do you agree with all that? I do agree with all that, Your Honor, and we're, like I said, we are perfectly okay with that. This is the position we have taken on appeal. Take the win. We are arguing the narrower issue because we will win under the narrow issue. If the court chooses the broader ruling, we're fine with that as well. But I take your point that guidance would be helpful in future cases. So if the court wants to answer that question, like I said, we're agnostic as to what that answer is. Appellants claim that their proposed deadline is mandated by 29 U.S.A. 1391, but that section says nothing about actuaries or assumptions. Their entire textual argument can be boiled down to the following logic. Section 1391 requires withdrawal liability to be calculated as of a measurement date. Okay, we agree with that part, but here's the logical leap. According to the appellants, the only way to calculate withdrawal liability as of a measurement date is to use assumptions that were selected before the measurement date, but that's just simply not true. As of doesn't mean that all of the inputs used in a withdrawal liability calculation must be compiled before the measurement date. As of just means as things stood on the measurement date. The actuaries talk about this in their amicus brief. As of is a term of art that comes up regularly in their field. Before your time runs out, I wanna ask you about the free look. Oh, sure, happy to turn to that. If I remember right, I could be misremembering on this. I think you suggested that your reading of the free look language does not render the partial withdrawal text irrelevant because it would do the following work. An employer withdraws completely before the end of five years, say, but there was originally a 90% partial withdrawal and then before five years was up, there was a 10% partial withdrawal. So, or withdrawal of the remaining 10%. And according to you, the employer would only get the benefit of the 10% withdrawal if it weren't for the partial language. I have follow up questions, but am I following that argument correctly, that theory correctly? Yeah, I think you generally have the gist of it. The idea is that there is a possibility that an employer withdraws in stages within the free look period. So, I think your hypothetical covered that, right? There's a, let's say a 90% withdrawal in year one and then a 10% withdrawal in year four. Upon the partial withdrawal, there will be an assessment of partial withdrawal liability. And then upon the complete, there'll be an assessment of complete withdrawal liability. The reason that the statute mentions both is because the free look can apply to either of them. If it just said something about complete withdrawals, there would be a question as to whether or not the partial withdrawal would be entitled to the free look. So, I think there's a lot of- There'd be a question of whether the 90% in my hypo or the 10% would be entitled- The 90, because in your hypo, that's the partial, right? This is very odd that you need the insertion of the partial text in order to do that work because after the 10% withdrawal, there would have been a complete withdrawal at that point. And then it seems like, you know, at that point, the arbitrator, the decision maker would say, look, there's been a complete withdrawal. So, you're entitled to all of the benefits of the free look exception. So, there's another provision of 1390. I think it's subsection A4. I don't have it in front of me. I apologize. But it talks about how you can only use the free look once. And so, it's not true that you have a seriatim withdrawal that you can just keep using the free look each time. No, you would get the credit for it after the complete withdrawal, after the 10% makes the withdrawal complete. But that's, they're separate assessments. That's how it works. So, there'd be a partial assessment, which would be paid starting in year one, and it's hypothetical. And then later, there would be a completed withdrawal assessment. Subsection four says you can only use the free look for one of those. Okay. Any other questions? Thanks very much. Thank you. Give me two minutes, I'm rebuttal. Thank you, your honors. Under the fund's view about actuarial assumptions in the statute, there is no temporal deadline for adopting actuarial assumptions. It doesn't have to happen by the measurement date. It doesn't have to happen by the withdrawal date. It could happen over a year later. And not only that, if there are multiple withdrawals, I think under the fund's view, the actuary could adopt different assumptions, different discount rates for each employer's withdrawal. Because at each point in time, under this theory, they would still be looking back in time to what existed on December 31st, but there's no limitation on their view about the different ways they could look at that or the different policies they could choose to adopt at different future dates. And I think that reading of the statute really takes as of the language from 1391 out of the statute altogether. Because if you can have different assessments of UVDs, when different employers withdraw in the next calendar year, you're no longer fixing UVDs at that measurement date. They're not necessarily pressing that point anymore, right? Because they say they're agnostic on what information can be taken into effect. So if this court were to rule, like the district court did, that you can calculate the actuarial assumptions after December 31st, but relying on information available on December 31st, then the situation you're describing wouldn't occur. Well, I think it depends on how you write that opinion, Your Honor. And I think it would be really important if that's the view that the court takes rather than the categorical rule of the Second Circuit. I think it's really important even in that situation to clarify that nothing other than the facts that existed on December 31st and were reasonably available could be considered. That means no input from the trustees could be considered that happened in January, because that's not anything having to do with the facts that existed on December 31st. And I think that's a very important point because if we're going to indulge in the idea that you could still put yourself back in time on December 31st, I think the actuary still, under that approach, would need to block out any input or change of direction that came from another source after December 31st. I know the free look issue was Mr. Vogel's and not yours, and it may not even be your client that is- I don't have a client that has a dog in that fight, Your Honor. But I'm sure Mr. Vogel would be happy to- Can I just ask? Thank you, Your Honors. My only question is, can you just respond to the theory that the opposing counsel floated about why partial withdrawal language would still do work under his theory of the free look? Well, their theory of the free look is that it should only apply if you are withdrawing in a series, in a bunch of stages, as long as you complete the full withdrawal before the end of the five years. But simply, that's not what the statute says. The statute says that you are entitled to it in either a partial or a complete withdrawal. So in the scenario that you gave that they have in their papers, where they had that first 90% partial withdrawal, that would be subject to the free look because the statute says so. Okay, so it sounds like you may be completely right. It's possible for you to be completely right, and also for him to be correct. Well, if his theory were correct in this case, that partial withdrawal text would still be doing some work under his theory. It would. Okay, it would. Doesn't mean he's right, but it would. And he's not. Very good. I'm grateful. Thank you. Great, thank you. Case is submitted.
judges: Rao, Walker, Childs